Good morning, Your Honor. May it please the Court, Brad Knafstra for the appellate. I'm kind of new to this ERISA law, but I'm going to try to outline it. My understanding is what errors I feel the district court made. What I think we're talking about here is the lack of the district court applying the right amount of skepticism to the abuse of discretion that the… Did the district court – I mean, I think I know the answer to this, but I want to hear your view. I don't see anywhere in the district court order a finding by the district court that there was a conflict of interest. The district talks about what might happen were there a conflict of interest, but I don't see a finding by the district court that there was. The district court – I don't know if they actually made a ruling that there was a conflict of interest, but the district court did apply it in its finding the fact that it was going to apply some skepticism, and it did outline in its decision numerous – at least according to my take on it – numerous instances of conflicts or abuses that it saw on the way that Hartford handled… Well, an abuse is different from a conflict. The conflict is I'm both administering the program and I'm paying out my own money. Well, I think that in the briefs we addressed that and that they agreed that Hartford was administering the plan. I mean, what I'm driving at is it seems to me quite clear that there is a conflict of interest under our case law, but it's possible that the district court in arriving at its conclusion that there's no cause of action in the end for your client didn't find that there was a conflict of interest and therefore perhaps the district court didn't apply the right standard. Okay. Thank you, Your Honor. I just – looking at the district court's decision, I'm a little taken aback. It goes through basically an outline of many of the things that Hartford did and why the district court felt that there was problems with the way that the administrator was looking at the evidence. It talked about the way that they put the letters together and sent it to Dr. Park and Dr. Brown, almost implying that he was okay and wanting them to sign off and then later on using that evidence against their decision. They also talked about part of their plan required Mr. Munch to file for Social Security and a disability. He did apply for that and they did reap a financial benefit from that, but then later on they decided that – and they're not required to, but they decided that he was able to do sedentary work and wasn't totally disabled. No, but Social Security finds him totally disabled, correct? I didn't hear you, Your Honor. Social Security finds him totally disabled, correct? Yes, totally disabled. Social Security Department found him totally disabled. What evidence did the Social Security Administration have in front of it when it made that determination? I suspect we don't have that fully in the record in front of us. I didn't handle that. I don't believe an attorney handled it. I believe he handled it himself, so I don't know if they took evidence. I don't know the answers. I don't know what they had. Counsel, I wonder if I could just go back for a minute to address the issue that Judge Fletcher asked you. He asked you whether the district court had made a finding about a conflict of interest and a level of skepticism. As I look at ER 1 at 283, the court specifically went through and analyzed there was a conflict and specifically state that the court reviews the decision and the professional assistance with some skepticism in light of the Abeyte and Firestone cases. Do you disagree with that? No, that's what the decision said. Okay, so from the plaintiff's perspective, the district court did understand that it needed to view this with there's a conflict of interest. There's clearly got to be some skepticism because you have the same entity evaluating and paying out its own money. The specific words, oh, there was a conflict of interest, I don't believe was present in the ruling, but the district court did go through their analysis. And in this case, going out with the Social Security issue, am I correct in assuming that the district, or rather the Sixth Circuit in Glenn had the entire record before it, whereas in this case, the only thing that Hartford had before it was the SSA's award letters as opposed to the entire record. Is that accurate? I'll be honest, I'm not sure. Okay. Did you represent him in the trial court? I didn't hear you, Your Honor. Did you represent Mr. Montour in the trial court? Yes, I did. Okay, but you chose not to put in the Social Security record. I didn't make an active decision not to put it in there. I did not. Yeah, but it's not in there. I don't believe it's in there. Yeah, okay. You just have the result, right. The reason I'm interested, and I suspect Judge Smith is interested, I would like to know what evidence the Social Security Administration had in front of it when it made this determination, and is it the same as the evidence that Hartford had in front of it? I understand, Your Honor. I understand what you're going on. I don't think it's totally necessary to prove that there was abusive discretion by the administrator. If you look at a body, and if you look at Glenn, look at the cases on this, the Panabecker case, and I like the Panabeckers, the way they describe how the court is supposed to look at any potential conflict. They're supposed to look at it to weigh the credibility of what the administrator is doing and how the administrator is viewing the evidence. And if you look at, if you go through the district court's analysis, the district court basically found fault with almost everything that the administrator was doing with respect to the evidence that was submitted. The fact that they don't necessarily have to send them to an independent medical evaluation, but that is another factor that the court could look at in determining whether they're acting fairly with respect to the claimant. And, you know, the overall analysis I think the district court did was basically establish that Mr. Montour has a severe lumbar spine condition and that it was hard for his decision to do only a record review and not actually do an independent medical evaluation. It was hard for his decision not to do an actual vocational rehabilitation examination when they would have had the opportunity to do that. And so what else could Mr. Montour have done to establish that he was disabled when in fact Hartford took no affirmative steps other than a paper review to determine whether he was in fact disabled or not. I'm not sure what the relevance of your answer is going to be. Did Mr. Montour ask Hartford to conduct an actual physical examination of him? Did he ask Hartford to go beyond the paper? No, he didn't. But when the claim was denied initially, Mr. Hartford did pay and go see Gene Bruno, who was a vocational rehabilitation expert, and submitted that with our appeal to Hartford saying, look, this is somebody that, you know, arguably is independent and physically examined him and did testing and found out that he can't be employed, he can't continue on working. And after that, they chose once again to just do a paper review and a lot of their doctors say, look, we know he's got a severe medical condition, but they say we saw this on the surveillance or we saw that we saw him carrying a package when in fact it was a prescription bag. They say we saw him driving his kids back and forth to school. But how does that prove that he doesn't have a lot of pain? How does that prove that he's not limited in his ability to work? What else could Mr. Montour have done to establish it when Hartford was in a position where they could have done these things? Because when somebody's sick, they're not looking to make an administrative record, okay? They're looking to get better. And if you look at the way that Hartford acted after this claim was presented and the way they sent these letters out and the way they did the surveillance, and even the judge criticizes them, the district court judge criticizes them on this, but then I don't see, then says, well, no, I don't think that mattered, that wasn't an abuse. But you can't tell how badly someone's hurt by looking at them on a video. You can't tell. I mean, maybe if they lift a sofa, but according to what they claim they saw in the video, there was nothing that established that Mr. Montour was able to work or complete the task that they said he could. Thank you. Why don't we hear from Hartford and we'll give you a chance to respond. Thank you. May it please the Court. Good morning, Your Honors. Dennis Rolstad for defendant and appellee Hartford Life and Accident Insurance Company. Your Honors, Judge Fischer did not commit clear error when following a court trial on the administrative record, she applied the abuse of discretion standard of review, and she found, based on the record, that Hartford did not commit clear error when it found that The standard on which she reviews Hartford is not clear error, but rather abuse of discretion, correct? Correct. But to find an abuse of discretion, it's necessary to find one of three things, a third of which is important here, that whether or not Hartford relied on clearly erroneous findings of fact. And I submit here that she found that Hartford did not rely upon clearly erroneous findings of fact in making its benefit decision. And for that reason, Hartford did not abuse its discretion in reaching the benefit decision it did. Did the district court, did Judge Fischer find a conflict of interest? She talks about it, but did she find a conflict of interest? I believe she did, and that's why she employed skepticism. Where? Where did she find conflicts of interest in her order? Well, if I may, Your Honor, I believe she discussed the conflict of interest test, and if there's a conflict of interest, then you look at skepticism. Then she actually did employ skepticism. If there had been no conflict of interest, there would be no reason to evaluate skepticism. So you're inferring from the fact of her skepticism that she found conflict of interest? I don't – I am, indeed, because otherwise she wouldn't have done it. I don't believe she put in a sentence statement saying – The closest sentence I see appears on page 19 of the decision. Hartford was both the plan administrator and funder of the plan, and evidence of this conflict of interest appears throughout the record. That probably does the trick. I think she didn't say it maybe as expressly as she might have, but what she applied certainly suggests that, okay, that's a given. Now we're going to talk about something else. That probably does the trick. The concern that I've got to have here, and I've got to say, when you read pieces of her decision, you sort of expect the result to come out the other way because she's finding fault with Hartford on various things, but in the end she comes back to the clear air standard. And the piece that gives me pause in particular is – it seems to be the strongest thing that she cites, and for what it's worth, this is on page 283, 284 of the ER. She points toward the problem in Dr. Kengella's analysis because if you add up what he says, the plaintiff's got to be bedridden for most of the day, and in fact he's not. And she concludes, however, plaintiff was able to sit or stand for four and a half hours during his in-home interview and there's no evidence to suggest that he was bedbound the rest of the day. The problem that I have, and the problem's too strong, the concern I have is that I don't know that that's inconsistent with being disabled, or put a different way, the capability that was demonstrated strikes me as difficult to square with holding a full-time job of any kind, that there's not affirmative evidence that suggests that an eight-hour day is within the capability of the plaintiff. Am I wrong factually, or is that not going to be enough to sustain plaintiff's position? I would say that's not enough to sustain the position. In fact, certainly the surveillance, and we don't want to overplay this, Hartford certainly doesn't, that is just one small piece of the total record. What Judge Fischer is looking at on the benefit decision is the record as a whole, and she's looking at all of the things in the record of which surveillance is a piece. Now, I have not yet seen the surveillance because I didn't see it in the ERs. It's in the record, so if I want to look at the surveillance tape, I can see it. Yes, it's on a CD that was submitted with the record, Your Honor. Okay, and what's that surveillance tape going to show me when I look at it? Well, it's going to show you roughly the things that are also in the descriptions. I mean, you can't look at the surveillance by itself and say, well, this person can definitely work, and that's why I think . . . Is it going to show me walking in the way that your people describe him as walking? Well, there are two different descriptions. The description on the surveillance was that there were no assistive devices and he appeared to be walking without difficulty. Now, that's my paraphrase. That's the language I remember. When I look at the tape, is that what I'm going to conclude? Yes. Well, at least one other description, and I've now lost track of where I saw it, but I think it was from the carrier side that acknowledged that the tape also shows a more gingerly activity on his part and didn't sound like it's an endorsement of this is somebody that's about to go off and play golf. If I may, that description does not come from the surveillance. That comes from the in-home interview. It's a multi-step process. First they did the surveillance. Then they always follow up with an in-home interview. Remember, there were two different companies that took surveillance. Hartford will continue to do this. There was a November and a December surveillance. Used two different third-party vendors to do this. Both of those third-party vendors said they're walking without difficulty. Followed up some months later with an in-home interview where a number of things happened. Mr. Montour identifies himself on the surveillance tape. They asked Mr. Montour, well, why are you disabled? And does your client base its denial of benefits in part on a conclusion that he's walking without difficulty? I would say the denial of benefits is based more on what the doctors say the tape means and the other medical evidence. That is, in this circumstance, there are three separate record reviewers, different doctors, looking at this evidence. Two from the physical side. One from the psychiatric side. So Hartford's more looking at what do these doctors say? Because they're the best ones able to interpret not only what the tape means but what all the medical records say. And did the doctors look at the surveillance tapes? Yes. Does Hartford concede that this is a close case? No. And I think the key to that, I don't believe Judge Fisher thought it was a close case. And I specifically brought up the last page of Judge Fisher's findings of fact. The first thing she says in this last paragraph is because plaintiffs did not provide sufficient evidence to establish his disability due to use of medication or psychiatric illness or to establish that the occupations listed in the employability analysis were beyond his physical capabilities, that is, before she even gets to abuse of discretion, she's saying there, plaintiff, she's found plaintiff didn't provide sufficient evidence. I understand this wasn't its noble standard. Because plaintiff didn't provide sufficient evidence, it was not an abuse of discretion for Hartford to conclude the plaintiff had not demonstrated his disability. I don't believe from that statement, Your Honors, that Judge Fisher thought it was a close case. Certainly, I believe Hartford did not think it was a close case. I do think they did a very thorough job of evaluation. That is, with the three different record reviews, contacting the doctors repeatedly. We can't forget that Dr. Park, I realized he was just the general practitioner, didn't believe that Mr. Montour was disabled. Mr. Yoshino, who isn't mentioned in the district court's opinion, but is in contact with the physical therapy company, they thought he was Mr. Montour. Can I just go back to one little point? I had asked opposing counsel about the meaning of the Glenn case, the Sixth Circuit case. Admittedly, in that case, the full record was there as opposed to here. There's simply an indication. We hear these social security disability cases all the time. They're very sad cases, but it is almost impossible to get social security disability coverage, and yet this man got it. Why should that have some bearing on our analysis of the level of evidence that was put forth here? Well, if I may approach this in two ways, Your Honor. Number one, and that's not my area of expertise, social security. I don't believe it is difficult in the end. In fact, if we look at the- You don't hear the case as a reader. Well, the difference is, of course, the treating physician rule. That is the big difference between social security and an independent benefit determination made pursuant to ERISA on a group policy. You do know some social security. I know a little bit because of NORD, Your Honor. In social security, if they see Dr. Kinglaw, a treating physician, saying that he's disabled, then Mr. Montour is entitled to social security disability benefits. Not automatically. Well, I can't- That's where- I'm not a social security practitioner. I can say that in social security there's a treating physician rule, whereas in ERISA there is not, and that's the big difference. Dr. Kinglaw then carries- maybe it's not determinative. I would say there's an incredible weight attached to that in the social security arena, whereas in ERISA it's not uncommon. In fact, as Judge Fischer mentioned in her opinion, in all these cases before her, she sees conflicting evidence. That's why somebody pursued the case. There is conflicting medical evidence, but that alone does not mean there's an abuse of discretion, even today. Indeed, I believe Judge Fischer very thoroughly reviewed the entire administrative record. I believe that Judge Fischer's determination, Your Honors, was not clearly in error. Thank you very much, Your Honors. Thank you. Response? I know you've saved a little over five minutes, if you want it. Thank you, Your Honor. You don't have to take it, but- I won't, Your Honor. I just wanted to reiterate one point, that if you look at the analysis that Judge Fischer did on the case, she pointed out that there is no real disagreement that Plaintiff has significant back injuries that cause him pain and limit his activities. Hartford will contend that, well, then we go to the video surveillance, because a record review, they say, yes, we know he's sick and we know he has these terrible conditions, but what we see on the surveillance says we believe he can work for four hours a day and he can sit for 30 to 45 minutes and all these other things. So the problem with that, the abuse or the arbitrariness of that is that when you actually look at the surveillance, and I would encourage Your Honors, if they haven't, to look at the surveillance, she puts in here, also, Judge Fischer says Hartford overstates and over-relies on the surveillance of Plaintiff. And she goes on the list that, look, all he's doing is picking up his grandkids and basically walking in a slow and stiff manner. And basically she's established that from the surveillance that that supported his self-reported limitations. Counsel, isn't the biggest problem that you've got here the actual definitions of disability, essential duty, and any occupation under the policy? It's a very tough definition. I agree, Your Honor, but the guy worked for this company, came back from the Vietnam War, worked for this company for 39 years, same company, and had a tough job, made decent money but probably not what he should have been making. And if he can't do it anymore and he says he can't do it, you know, if Dr. Kingle says he's terminally disabled, if Gene Bruno's got 30 years in the business, is done testing and says he can't do it, I think he probably can't do much of anything at that point, according to the doctors and Mr. Bruno. And somebody that, I mean, he likes his job, you know. I mean, he likes his job. So if you look at Glenn, just this last thing, and I don't want to take up any more of anybody's time, but if you look at Glenn in a body, they talk about the more things that Hartford does that appear to be in conflict, such as, this is one part, I'll just read this one part from a body, that going forward, plaintiffs will have the benefit of an abusive discretion review that always considers the inherent conflict when a plan administrator is also a fiduciary, even in the absence of a smoking gun, evidence of conflict. And then they go on to talk about if Hartford wants to get away from that or they want to show the court or show the claimant that they are doing their job, the administrator might demonstrate that it used truly independent medical examiners or a neutral or an independent review process. And it goes on to describe what they could have done so that we wouldn't be here today and they could have done more to make sure they were making the right decision. But I don't think they did want the right decision. I think they do the paper reviews because that way you really can't touch, see the guy flex and extension and do all the things that you can see when you actually touch a patient you can observe. I had spine surgery myself, and I can tell you that I went out and coached my daughter's team even when I was in the worst pain. And you could have took photographs of me and said, oh, he looks like he can work. He looks perfectly fine to me. But I guess in a nutshell, I think a decision should be ruled in favor of the claimant and the decision should be overturned. Thank you. Okay. Thank both sides for their argument. And Montour versus Hartford Life and Accident Insurance Company, that completes our argument calendar for this morning. We're now in adjournment. What I think we'll do is we'll leave the bench. And as soon as the students come back in, would you just give us a call and we'll come out. Okay. Thank you.
judges: Fletcher W. , Fisher, Smith M.